# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Real Alternatives,                 :
               Petitioner       :
                                :
           v.                    :    No. 106 M.D. 2017
                                :    Argued: June 8, 2017
Pennsylvania Department of the      :
Auditor General and Department       :
of Human Services,               :
                Respondents    :

**BEFORE:**     **HONORABLE RENÉE COHN JUBELIRER,** Judge
                    **HONORABLE JULIA K. HEARTHWAY,** Judge
                    **HONORABLE DAN PELLEGRINI,** Senior Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                **FILED: July 3, 2017**

Petitioner Real Alternatives (RA), a private, Section 501(c)(3)[1] non-profit corporation, is the recipient of a grant from the Department of Human Services (DHS) to administer a program that provides free alternatives to abortion services to women in the Commonwealth. Respondents are the Department of the Auditor General (DAG) and DHS. Pursuant to the Grant Agreement, RA is to enter into general service provider agreements with its network of service providers and to reimburse the service providers, in full, for all direct services performed pursuant

---

[1] Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

to a specific schedule of costs set forth in the Grant Agreement. RA has also entered into separate "secondary" "Program Development and Advancement Agreements" with its service providers, through which service providers agree to remit 3% of the service provider's reimbursements to RA to use for non-grant related educational services and other expenses to advance alternatives to abortion services locally and nationally. RA deducts the 3% fee as an "offset," deposits the 3% fee into its corporate account, and reimburses the service providers for the scheduled cost of direct services less the 3% fee. DAG requested production of receipts and expenditure documentation related to RA's spending of the 3% offset payments. RA admits it does not use the 3% funds for grant purposes and contends the funds are private, corporate funds. RA filed a Petition for Review in the Nature of a Complaint for Declaratory[2] and Injunctive Relief (Petition for Review), to which DAG and DHS filed a joint response in opposition. Both RA and DAG and DHS have filed cross Applications for Summary Relief, which are before the Court for expedited consideration.[3] At issue is whether DAG and DHS can require the production of receipts and expenditure documentation related to RA's spending of the 3% offset payments.

These material facts are not in dispute. In July 2012, DHS awarded RA a grant to administer the statewide "Alternative to Abortion Services Program"

---

[2] RA seeks a declaratory judgment pursuant to the Declaratory Judgments Act, 42 Pa. C.S. §§ 7531-7541.

[3] RA filed an Application to Expedite and for Oral Argument on April 21, 2017, citing a letter from DHS, in which DHS notified RA that it intends to disapprove expenditures to RA in the amount of 3% on the basis that RA has not been in compliance with the terms of the Grant Agreement and has refused to produce documents related to the 3% fee. (*See* DHS Letter to RA, Apr. 20, 2017 (attached to Application to Expedite).) DAG and DHS filed an Answer pursuant to this Court's Order dated April 25, 2017. This Court granted the Application to Expedite via Order dated May 2, 2017.

(Program), which provides free alternatives to abortion to women in the Commonwealth. (Petition for Review, Ex. A, Grant Agreement Work Plan at 1.) The direct services[4] are administered through a network of 29 service providers which operate within the Commonwealth. The Program is funded in the form of a legislative grant to DHS,[5] which awarded the $30,216,440 grant to RA to be administered over the course of five years, and which is set to expire on June 30, 2017.

Under the Grant Agreement, RA receives the funds from DHS and reimburses the service providers on a contractual fee-for-service basis, pursuant to general service provider agreements, after all services have been performed. The Grant Agreement requires that RA "shall use the funds granted . . . to faithfully implement the conditions of th[e] grant and operate the [P]rogram" pursuant to a very specific schedule of costs, which is part of the Grant Agreement.[6] (*Id.*, Grant

---

[4] The direct services provided include counseling, adoption referral, temporary housing, and other services.

[5] The Legislature appropriated these funds to DHS for "Expanded Medical Services." (Petition for Review, Ex. A, Grant Agreement at 1.) RA also receives federal funding for the Program, which is included in the $30,216,440, through the Temporary Assistance for Needy Families (TANF) Block Grant, the funds of which DHS distributes to RA to be used in accordance with the current Pennsylvania TANF State Plan. (*Id.*, Grant Agreement Work Plan at 14; Budget Summary, Rider 3 at 1-2.) The TANF funds are to be used "for services to women whose gross family income is below 185% of the Federal Poverty Guidelines." (*Id.*, Grant Agreement Work Plan at 14 (internal quotation marks omitted).)

[6] RA is required to reimburse service providers in accordance with the Payment Provisions set forth in Rider 1 of the Grant Agreement, RA's Work Plan under the Grant Agreement, and the Estimated Annual Budget Summary set forth in Rider 3. (Petition for Review, Ex. A.) The Work Plan sets forth reimbursement rates, in pertinent part, as follows:

> In accordance with the [] Service Provider Agreement, [RA] will reimburse the Service Provider for services provided to eligible clients at the rate of $1.05 for each minute of counseling and referral provided; $10.50 for each pregnancy test kit per client visit; $2.00 for each Food, Clothing or Furniture Pantry visit (not to

**(Footnote continued on next page…)**

3

Agreement at 1.)  The total amount of the Grant Agreement provides for both RA's administrative costs and the service providers' direct services costs.  (*See id.*, Budget Summary, Rider 3 at 1-2.)  The Grant Agreement also provides that RA must comply with all federal and state audit requirements and further that it must maintain and preserve all books, records, and documents that are related to the Grant Agreement in the event an audit is deemed necessary.  (*Id.*, Audit Clause A.)

RA executes general, fee-for-service Service Provider Agreements with its service providers.  In addition, RA enters into a separate "secondary" "**Program Development and Advancement Agreement**" with its service providers, the purpose of which is "to provide funding for the development and advancement of [RA's] life-affirming programs and missions, both locally and nationally."  (RA's Application for Summary Relief at 4-5; *see also* Petition for Review, Ex. B, RA "Program Development and Advancement Agreement" (RA agrees "to use the funds generated by the Program Development and Advancement fees received from all Service Providers for educational services and other expenses deemed necessary by [RA] to advance alternative to abortion services.").)  There is no reference to any separate Development and Advancement Agreement in the Grant Agreement.  The Development and Advancement Agreements provide that the service providers will "remit to [RA] a Program Development and Advancement fee of three percent (3%) of the Service Provider's reimbursement under the

---

**(continued…)**

exceed 4 visits per client per pantry type) as long as each visit is accompanied by at least 20 minutes of counseling; $21.00 for each class per client taught; and $5.25 for administrative time spent completing a [] Billing Form only when funding levels permit . . . .

(*Id.*, Grant Agreement Work Plan at 7-8.)

4

Service Provider Agreement . . . ." (Petition for Review, Ex. B, Development and Advancement Agreement.) RA deducts the 3% fees as offsets from the service providers' monthly statements for services already performed under the Grant Agreement and deposits the 3% fees directly into RA's private corporate account. Monthly statements of payment show that service providers receive their monthly reimbursements "[l]ess the [Program Development and Advancement] fee (.03 x gross amount earned)." (*Id.*, Ex. C, Monthly Statements of Payment.)

DHS' Bureau of Financial Operations (BFO) conducted a performance audit of RA for the period of July 1, 2012, to June 30, 2015, during which DHS became aware of the 3% fee offset by RA.[7] (Letter from Gov. Office of Gen. Counsel, Feb. 8, 2016.) DHS requested all documentation related to the collection and use of the 3% fee, which RA declined to produce. (Petition for Review, Ex. D, Final Report, App. A-B.) While the final audit report, issued April 25, 2016, found RA to be generally in compliance with the grant requirements, it stated that RA "collects the fee by reducing the service providers' claim reimbursements; however, the total provider service claim amounts are invoiced to DHS as direct services."[8] (*Id.*, Finding Nos. 1, 3.) The audit also noted that, during the course of the audit, RA stated that the 3% offset payments were "used to fund expenses that

---

[7] The BFO also made findings regarding inappropriate billing identified at service providers and internal control weaknesses at RA. (Petition for Review, Ex. D, Final Report, Finding Nos. 1-2.)

[8] The BFO also listed a number of observations regarding why it questioned the 3% fee, including that: there is no language in the agreements between RA and the service providers suggesting that the fee is voluntary; two of three service providers interviewed did not agree that the fee was voluntary; the fee is automatically deducted from the reimbursements; RA invoices DHS for the total claim amounts as a direct service, and, as such, it overstates the amount it paid for direct services; RA refused to allow BFO to audit the expenses funded by the fee; and RA could not produce any documentation showing that it received DHS' permission to assess the fee. (Petition for Review, Ex. D, Final Report at 5.)

5

are not permitted under the Grant Agreement, such as travel and other expenses to support advancement of the program in other states." (*Id.*, Final Report at 5; *see also* DAG/DHS Response in Opposition, Ex. B, Declaration of Alexander Matolyak, Director of the Division of Audit Review, BFO, dated Apr. 3, 2017 (stating that "RA reiterated its position at the audit closing conference on November 19, 2015, also noting that the money generated by the 3% fee was used for activities not covered by the grant.").) Accordingly, the BFO recommended that DHS' Office of Social Programs (OSP) determine whether the collection and use of the 3% fee is appropriate.[9] (*Id.* at 6.)

On September 13, 2016, DHS requested that DAG perform an audit of RA. (DAG/DHS Response in Opposition, Ex. C, DHS Letter to DAG, dated Sept. 13, 2016.) While specifically acknowledging that "[a]ccording to RA, the three percent fee 'is used to fund expenses that are not permitted under the Grant Agreement[,]'" the letter also stated that the "denial by RA [regarding the documentation about the 3% fee] prevented DHS from determining if the revenues deducted from provider payments were used for payment for direct services per our [G]rant [A]greement and solely to benefit the Pennsylvania program." (*Id.*) DAG responded that it would conduct a performance audit of DHS with regard to

---

[9] The BFO recommended the following regarding the 3% fee:

- If it is determined to be appropriate, OSP should redefine the expense categorization and specify the potential uses of the fee in the Grant Agreement.
- If it is determined to be inappropriate, OSP should either recover the funds from RA or require RA to refund the fees to the service providers, and revise the Grant Agreement to prohibit such fees . . . .

(Petition for Review, Ex. D, Final Report at 6.)

the Grant awarded to RA, the relevant objective of which would be to "[r]eview the expenditures and expenditure documentation for the three percent fee (3%) that [RA] assesses its service providers and determine whether this fee is an appropriate use of funds in accordance with the [G]rant [A]greement." (*Id.*, Ex. D, DAG Letter to DHS, dated Sept. 23, 2016.) "[I]n order for [DAG] to complete [its] audit objective of ensuring that all of the state grant funding was appropriately spent and used in accordance with the [G]rant [A]greement," DAG asked DHS to request from RA "all supporting documentation." (Petition for Review, Ex. E, DAG Information Request to DHS, dated Jan. 26, 2017.) DHS forwarded the request to RA, requesting, "[i]n connection with the audit objective. . . [,] documentation showing the use of the three percent fee . . . ." (*Id.*, DHS Letter to RA, dated Feb. 3, 2017.)

RA retained counsel, who initially informed DAG through a series of emails that RA would produce the documents. (DAG/DHS Response in Opposition, Ex. F, Emails.) However, on March 15, 2017, RA filed its Petition for Review and Application for Summary Relief with this Court and informed DAG that it would "not be producing any receipts or expenditure documentation related to how [RA] spends the private 3% offset payments it receives from its service provider[s] . . . ." (RA Br., Ex. A, Letter from RA Counsel to DAG, dated Mar. 15, 2017.)

In resolving the cross-applications for summary relief, we are aware that, pursuant to Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1532(b), the Court may grant summary relief "where the moving party establishes that the case is clear and free from doubt, that there exist no genuine issues of material fact to be tried and that the moving party is entitled to relief as a

7

matter of law." *Dep't of Auditor Gen. v. State Employees' Ret. Sys.*, 860 A.2d 206, 210 (Pa. Cmwlth. 2004).

RA does not dispute that both DAG and DHS have the authority to audit receipts and expenditure documentation related to the use of the state grant funds. RA argues that DAG does not have the authority, under the express terms of the Grant Agreement or the Fiscal Code,[10] to compel the production of, or audit, the documents related to the 3% fee because such documents are "private corporate records" and concern the use of "private corporate funds" that RA receives from its service providers pursuant to secondary Development and Advancement Agreements. RA admits that the funds it collects from the 3% fee are not used to pay for services under the Grant Agreement, (RA Application for Summary Relief at 14), and that "it could not use state grant funds to develop and advance its pregnancy support programs nationally . . . ." (RA Answer in Opposition at 12.)

DAG and DHS argue that, consistent with the Pennsylvania Constitution,[11] the Fiscal Code, and the express terms of the Grant Agreement, DAG has the authority to conduct a performance audit of a DHS-awarded grant and to access all documentation related to the expenditure of grant money to assure that it is being spent in accordance with the terms of the Grant Agreement. The Grant Agreement requires that the grant funds be used "to faithfully implement the conditions of th[e] grant and operate the [P]rogram . . ." and that RA reimburse the service providers pursuant to a specific schedule of costs. (*See* n.6 above.) Despite those

---

[10] Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§ 1-1805.

[11] Article VIII, Section 10 of the Pennsylvania Constitution provides, in pertinent part, that: "[t]he financial affairs of any entity funded or financially aided by the Commonwealth, and all departments, . . . [and] agencies, . . . of the Commonwealth, shall be subject to audits made in accordance with generally accepted auditing standards." Pa. Const. art. VIII, § 10.

express terms, DAG and DHS contend that RA is not spending the grant money in accordance with the terms of the Grant Agreement because only 97% of the contractually specified amounts ever reach the service providers.[12]

In accordance with the Letter from DAG to DHS, the audit is to be conducted "under the authority of Sections 402[13] and 403 of The Fiscal Code[,]" which set forth the Auditor General's powers and duties. (DAG/DHS Response in Opposition, Ex. D, DAG Letter to DHS, dated Sept. 23, 2016.) Section 403 of the Fiscal Code, 72 P.S. § 403, provides, in relevant part, as follows:

> The Department of the Auditor General shall have the power, and its duty shall be, to audit the accounts and records of every . . . corporation, and public agency, receiving an appropriation of money, payable out of any fund in the State Treasury . . . **as far as may be necessary to satisfy the department that the money received was expended or is being expended for no purpose other than that for which it was paid.** Copies of all such audits shall be furnished to the Governor.
>
> If at any time the department shall find that any money received by any . . . corporation, or public agency, has been expended for any purpose other than that for which it was paid, it shall forthwith notify the Governor, and shall decline to approve any further requisition for the payment of any appropriation . . . to such . . . corporation . . . until an amount equal to that improperly expended shall have been expended for the purpose for which the money improperly expended was received from the State Treasury.

---

[12] DAG and DHS have concerns that by only reimbursing service providers 97% of what they are owed and withholding the 3% fee from the contractually specified reimbursements due, the service providers will begin, or are already, providing lower quality or less service to women in the Commonwealth under the Program. Further, other entities that receive state funds may be incentivized to enter into secondary agreements to withhold even more than 3% of their state funds received.

[13] Section 402 generally provides DAG authority to audit the affairs of departments, boards and commissions of the executive branch of government. 72 P.S. § 402.

9

*Id.* (emphasis added).

The objective of DAG's audit is to "[r]eview the expenditures and expenditure documentation for the three percent fee (3%) that [RA] assesses its service providers and determine whether this fee is an appropriate use of funds **in accordance with the [G]rant [A]greement**." (DAG/DHS Response in Opposition, Ex. D, DAG Letter to DHS, dated Sept. 23, 2016 (emphasis added).) However, RA "readily admits the 3% offset payments are not used by [RA] for purposes described in the Grant Agreement; instead, they are used, as agreed to by the service provider vendors, to develop and advance [RA's] life-affirming programs and missions, both locally and nationally." (*See* RA's Answer in Opposition at 6.) DHS, when requesting the audit, acknowledged to DAG that, "[a]ccording to RA, the three percent fee 'is used to fund expenses that are not permitted under the Grant Agreement.'" (DAG/DHS Response in Opposition, Ex. C, DHS Letter to DAG, dated Sept. 13, 2016.) Thus, there is no dispute that RA is not spending these funds for purposes described in the Grant Agreement. It is, therefore, not clear how DAG's objective, determining whether the fee is an appropriate use of funds **in accordance with the Grant Agreement**, requires auditing the use of the 3%, which is admittedly used to fund expenses that are not permitted under the Grant Agreement. At oral argument before this Court, when asked, DAG could provide no reason as to why it is necessary to audit the documentation relating to the 3% fee to achieve DAG's objective. The Fiscal Code grants DAG "the power . . . to audit . . . **as far as may be necessary** to satisfy the department that the money received [by RA from DHS to operate the Program] was expended or is being expended for no purpose other than that for which it was paid." 72 P.S. § 403 (emphasis added). Under these facts, there is no

evidence in this record that the proposed audit of RA's documentation relating to the 3% fee falls within the authority asserted by DAG in support of the audit. *Accord, Stilp v. Commonwealth*, 898 A.2d 36, 42 (Pa. Cmwlth. 2006) (holding that DAG does not have legal authority to audit the General Assembly under the Constitution or any provisions of the Fiscal Code), *aff'd on other grounds sub nom. Stilp v. Commonwealth, Gen. Assembly*, 940 A.2d 1227 (Pa. 2007); *see also* Section 1001 of The Administrative Code of 1929, 71 P.S. § 311 (DAG "shall exercise its powers and perform its duties **as provided in the Fiscal Code and other applicable laws**.") (emphasis added).

Accordingly, we deny the cross-applications for summary relief.[14]

_____
**RENÉE COHN JUBELIRER,** Judge

---

[14] We do not reach issues relating to the public and private nature of the funds or the permissibility of the 3% fee, as the record before us is not sufficient for such determinations, nor are they necessary to resolve whether, on the undisputed facts before us, the law is clear that summary relief is appropriate.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Real Alternatives, : 
                Petitioner : 
                 : 
              v. :   No. 106 M.D. 2017
                 : 
Pennsylvania Department of the : 
Auditor General and Department : 
of Human Services, : 
             Respondents : 

## O R D E R

**NOW**, July 3, 2017, upon consideration of the cross-applications for summary relief filed by Real Alternatives and the Pennsylvania Department of the Auditor General and the Department of Human Services, in the above-captioned matter, the cross-applications are **DENIED**.

 

 

_____
**RENÉE COHN JUBELIRER,** Judge